IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BROTHERHOOD OF MAINTENANCE OF | ) | |
| WAY EMPLOYEES DIVISION/IBT, | ) | |
| Petitioner, | ) | |
| v. | ) | 10 C 7545 |
| | ) | |
| | ) | Judge Virginia M. Kendall |
| NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

This case arises out of an arbitration Award made by Special Board of Adjustment

No. 1048, sustaining the termination of Norfolk Southern Railway Company employee

Steven L. Kawa. Kawa is represented by the Brotherhood of Maintenance of Way

Employees Division/IBT, which has petitioned this Court to vacate the arbitration Award

entered against Kawa and remand the case to the Special Board of Adjustment. The

Railway Labor Act confers jurisdiction upon this Court to review Special Board of

Adjustment awards. *See* 45 U.S.C. § 153 First (q). Mindful that "the scope of judicial review

of Adjustment Board decisions is among the narrowest known to the law," *Union Pac. R.R.*

*v. Sheehan*, 439 U.S. 89, 90 (1978), the Act empowers this Court to set aside an award in only

three very narrow circumstances. *See Id.* at 93 (an RLA arbitration award may be set aside

1

"only for the three reasons specified [in § 3 First (q)]. We have time and again emphasized that this statutory language means just what it says."). Those circumstances are: (1) failure of the Board to follow the requirements of the Act; (2) failure of the award to conform or confine itself within the scope of the Board's jurisdiction; and (3) fraud or corruption by a member of the Board making the award. *See* 45 U.S.C. § 153 First (q).

This case involves the third basis upon which this Court may vacate and remand an award by a Special Board of Adjustment: for fraud or corruption by a member of the Board. The Petitioner in this case alleges that the carrier's partisan Board member committed fraud within the meaning of that term in the Act by failing to disclose to the other members of the Board that certain evidence used in the on-the-property disciplinary hearing was allegedly fraudulent or baseless, or alternatively, that the carrier's partisan Board member committed fraud by failing to undertake an independent investigation of the evidence and its author.

The Union and the Railway each moved for summary judgment, both claiming that each is entitled to judgement as a matter of law in its respective favor. For the reasons set forth below, the Court denies the Brotherhood of Maintenance of Way Employees Division/IBT's Motion for Summary Judgment and grants Norfolk Southern Railway Company's Motion for Summary Judgment. The Award of the Special Board of Adjustment No. 1048 sustaining the discharge of Steven L. Kawa cannot be set aside under

the narrow standard of review set forth by Section 3 First (q) of the Railway Labor Act and it is therefore entitled to deference by this Court.

## I. The Undisputed Material Facts

Norfolk Southern Railway Company (hereafter "NSR") is a "carrier" within the meaning of the Railway Labor Act (hereafter "RLA"), 45 U.S.C. § 151 First. (BMWED 56.1 Resp. ¶ 1).[1] NSR employees in the maintenance of way craft are represented by the Brotherhood of Maintenance of Way Employees Division/International Brotherhood of Teamsters (hereafter "BMWED"). (*Id.* ¶ 2). BMWED is a "representative" of these NSR

---

[1]The parties submitted to this Court their Local Rule 56.1(a)(3) Statements of Material Facts in Support of Summary Judgment. The Brotherhood of Maintenance of Way Employees Division's LR 56.1(b)(3)(B) response to Norfolk Southern Railway Company's LR 56.1(a)(3) Statement of Material Facts is abbreviated here as "BMWED 56.1 Resp ¶ _." Norfolk Southern Railway Company's LR 56.1(b)(3)(B) response to the Brotherhood of Maintenance of Way Employees Division's LR 56.1(a)(3) Statement of Material Facts is abbreviated here as "NSR 56.1 Resp. ¶ _." The Brotherhood of Maintenance of Way Employees Division submitted a Statement of Additional Facts That Require the Denial of Summary Judgment pursuant to LR 56.1(b)(3)(C). Norfolk Southern Railway Company's response to those additional facts is abbreviated here as "NSR Add'l 56.1 Resp. ¶ _." Norfolk Southern Railway Company did not submit a separate Statement of Additional Facts That Require the Denial of Summary Judgment pursuant to LR 56.1(b)(3)(C). Nevertheless, the Brotherhood of Maintenance of Way Employees Division responded to certain statements submitted in Norfolk Southern's 56.1(b)(3)(B) response to the Brotherhood of Maintenance of Way Employees Division's LR 56.1(a)(3) Statement of Material Facts in Support of Summary Judgment as if they were additional facts submitted pursuant to LR 56.1(b)(3)(C). The Brotherhood of Maintenance of Way Employees Division's response to Norfolk Southern's "additional material" is stricken as improper. The Court will independently ensure that Norfolk Southern's submission does not contain arguments or facts that go beyond the scope of a proper LR 56.1(b)(3)(B) response. Norfolk Southern chose to forgo submitting additional facts pursuant to LR 56.1(b)(3)(C); the Brotherhood of Maintenance of Way Employees Division may not isolate portions of Norfolk Southern's response to its LR 56.1(a)(3) Statement of Material Facts in Support of Summary Judgment to attack as what it perceives to be additional facts.

employees within the meaning of the RLA, 45 U.S.C. § 151 Sixth. (*Id.*). NSR and BMWED are parties to various collective bargaining agreements that set forth the wages, hours, working conditions, and other terms and conditions of employment of NSR employees represented by BMWED. (*Id.*).

In 2001, NSR and BMWED entered into a System Discipline Rule (hereafter "SDR"), which amended Rule 30 of the collective bargaining agreement between BMWED and an NSR predecessor, the Norfolk and Western Railway Company, which is applicable to the former Norfolk and Western Railway Company territories on the NRS system, and Rule 40 of the collective bargaining agreement between BMWED and another NSR predecessor, the Southern Railway Company, which applies on the former Southern Railway properties. (*Id.* ¶ 4). The SDR provides simply that "an employee who has been in service more than sixty (60) calendar days shall not be disciplined or dismissed, nor will an unfavorable mark be placed upon their record without a fair and impartial investigation." (*Id.* ¶ 5).[2] The

---

[2]BMWED disputes this characterization of the SDR. BMWED's dispute consists largely of improper argument and conjecture. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n. 2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts. We have held that a district court has broad discretion to require strict compliance with Local Rule 56.1.") (internal citations omitted); *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (a party's statement of material facts submitted pursuant to Local Rule 56.1 is improper where it is "filled with irrelevant information, legal arguments, and conjecture."). Furthermore, the record evidence that BMWED cites as support for its argument, the Supplemental Affidavit of Steven V. Powers, does not show that Powers has personal knowledge of, or is competent to testify to, these facts and therefore does not set out facts that would be admissible in evidence as required by Rule 56(c)(4) of the Federal Rules of Civil Procedure. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 ("The evidence supporting a factual assertion must represent admissible evidence."). The evidence submitted by NSR, SDR §

4

employee must be given not less than ten days' advance notice of the investigation hearing setting forth the precise charges against the employee. (*Id.*). A written transcript of statements taken at the investigation must be made and provided to BMWED. (*Id.*). The employee may be represented at the investigation by a duly authorized BMWED official. (*Id.*). Neither NSR nor BMWED or its members are permitted to have outside lawyers participate in the on-property disciplinary hearings. (NSR Add'l 56.1 Resp. ¶ 19). The SDR provides that an employee may appeal from an adverse disciplinary decision, initially to the highest designated NSR officer. (BMWED 56.1 Resp. ¶ 5). If the matter cannot be resolved, an appeal may be taken to "a special board of adjustments" that "shall be established with jurisdiction over such disputes involving disciplinary matters resulting in dismissal, suspension or reprimand to provide expedited resolution of such disputes." (*Id.*).

Over the years NSR and BMWED have established several special boards of adjustment (hereafter "SBA") under RLA § 3 Second (second para.), 45 U.S.C. § 153 Second (second para.), to issue final and binding arbitration awards resolving disputes arising from employee discipline. (*Id.* ¶ 6). One SBA has been designated SBA No. 1048 by the National Mediation Board. (*Id.*). NSR and BMWED have selected Richard K. Hanft to serve as the Chairman and Neutral Member of the three-member SBA No. 1048. BMWED selects the

---

(g) and the Declaration of Dennis L. Kerby, adequately substantiates NSR's factual assertion.

Employee Member of the Board. (*Id.*). For many years, Dennis L. Kerby, formerly Assistant Director of Labor Relations and Director Labor Relations and now Assistant Vice President Labor Relations, has served as the Carrier Member of the Board. (*Id.*). Kerby has been a management employee of NSR for 23 years in the NSR Labor Relations Department, with responsibility for maintenance crafts. (NSR 56.1 Resp. ¶ 29). Kerby has a degree in civil engineering. (*Id.* ¶ 30). The SBA Agreement does not impose any limitations on who can be selected by BMWED to serve as the Employee Member of the Board or who can be selected by NSR to serve as the Carrier Member of the Board. (BMWED 56.1 Resp. ¶ 6). The NSR *Investigation and Discipline Policy Manual*, dated January 1, 2009, prohibits an NSR officer who appears as a witness at an investigation from later acting as the appeals officer and deny a claim in the same case. (NSR 56.1 Resp. ¶ 32).

Steven S. Kawa began working for an NSR predecessor as a BMWED-represented maintenance of way employee on June 27, 1978. (BMWED 56.1 Resp. ¶ 7). Kawa had a positive disciplinary record prior to his dismissal from NSR. (NSR 56.1 Resp. ¶ 3). On July 6, 2009, Kawa reported that he sustained an injury while driving an NSR gang truck along Interstate 94 near Ypsilanti, Michigan. (BMWED 56.1 Resp. ¶ 8). He reported that when he drove the truck over an uneven patch of pavement his head "jammed against the ceiling of the truck," injuring him. (*Id.*). Kawa grumbled when the truck hit the uneven pavement, said something about it, and continued to drive approximately twenty miles further before

asking a co-worker to drive for him because he said his neck and back were hurting. (NSR 56.1 Resp. ¶ 6). Kawa filed a federally required injury report when he received medical treatment for his injury. (*Id.* ¶ 7). The driver's seat of the truck was not tethered to the truck, despite prior worker complaints and a warning on the tether. (*Id.* ¶ 8). During the following days, NSR managers investigated Kawa's report and concluded that there was reason to believe he had exaggerated, if not completely fabricated, his injury. (BMWED 56.1 Resp. ¶ 9).[3]

On or around July 14, 2009, Kerby received a call from NSR Assistant Division Engineer Michael Difilippantonio asking him to review certain file materials concerning the Kawa incident and to let him know what Kerby thought might be an appropriate charge. (*Id.* ¶ 10). On July 14, 2009, Stephen Whitaker, a clerk in NSR's Lake Division Superintendent's Office, sent Kerby an email with the Kawa injury file, which would have included the Form 22 injury report prepared by Kawa and the initial writeup from his supervisors concerning what happened in the incident. (*Id.*). In Kerby's capacity as Assistant Director of Labor Relations with responsibility for the maintenance of way craft,

---

[3]BMWED attempts to dispute this fact. Its dispute consists of improper argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060. The evidence submitted by NSR in support of this fact, the Declaration of Dennis L. Kerby, adequately substantiates NSR's factual assertion. Furthermore, the record evidence that BMWED cites as support for its argument, the Supplemental Affidavit of Steven V. Powers, does not show that Powers has personal knowledge of, or is competent to testify to, these facts and therefore does not set out facts that would be admissible in evidence as required by Rule 56(c)(4) of the Federal Rules of Civil Procedure. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382.

he was asked to provide suggested language for the charge letter that local management desired to be sent to Kawa based on information contained in the file. (*Id.*). This request was not atypical of the requests for advice made by local management to NSR's Labor Relations Department. (*Id.*).

On July 14, 2009, Kerby responded by email to Difilippantonio. (*Id.* ¶ 11). Kerby outlined in his response two possible approaches for a charge. (*Id.*). First, he noted that if local management did not believe that Kawa had hit his head, they would have to rely heavily on the report of a consultant that Kerby had been informed was being retained to conduct a reconstruction of the incident and on the testimony of witnesses to the occurrence. (*Id.*). Second, he observed that if it was determined that Kawa had made contact with the truck ceiling, it might be determined that such contact was not sufficient to result in the degree of injury Kawa alleged. (*Id.*). Kerby provided Difilippantonio with suggested language for the Kawa charge letter. (*Id.*).[4] Subsequent to Kerby's communications with Difilippantonio, he understood that local management engaged

---

[4]BMWED asserts that Kerby personally provided the details he expected the consultant would provide, knowing all along that the consultant's work was unreliable and inaccurate. This contention is impermissible argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060. Furthermore, the record evidence that BMWED cites as support for its argument, the Supplemental Affidavit of Steven V. Powers, does not show that Powers has personal knowledge of, or is competent to testify to, these facts and therefore does not set out facts that would be admissible in evidence as required by Rule 56(c)(4) of the Federal Rules of Civil Procedure. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382. The evidence submitted by NSR in support of this fact, including the Declaration of Dennis L. Kerby and the July 14, 2009 email to Difilippantonio, adequately substantiates this fact.

Richard Hughes, a consulting engineer, to conduct a re-enactment of the Kawa incident and to prepare a report. (*Id*. ¶ 12). Kerby did not see a copy of the Hughes report until after the Kawa hearing and did not know what it contained. (*Id*.).[5]

Kerby's only involvement in the Kawa matter prior to the disciplinary hearing was his response on July 14, 2009 to Difilippantonio's request for advice as to the charge(s) that might be brought against Kawa and the language to be used in the charge letter. (*Id*. ¶ 13). Kerby did not form any opinions at that time concerning Kawa's alleged conduct because he had not seen the evidence that would be presented by NSR and by Kawa's representatives at the disciplinary hearing. (*Id*.). Kerby's involvement in helping to shape the charges against Kawa consisted solely of the advice he gave to Difilippantonio. (*Id*.). This was the kind of advice routinely given by him and others in the Labor Relations Department upon request from local management. (*Id*.). Kerby played no role in the aggregation of evidence against Kawa. (*Id*.). The selection of evidence–both the witness testimony and the documentary evidence–that would be submitted at the disciplinary hearing was made solely by Kawa's local managers. (*Id*.)

_____

[5]BMWED attempts to dispute these facts. Its dispute is improper argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060. Furthermore, the record evidence that BMWED cites as support for its argument, the Supplemental Affidavit of Steven V. Powers, does not show that Powers has personal knowledge of, or is competent to testify to, these facts and therefore does not set out facts that would be admissible in evidence as required by Rule 56(c)(4) of the Federal Rules of Civil Procedure. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382. The evidence that NSR supplies as support for this fact, the Declaration of Dennis L. Kerby, adequately substantiates this fact.

On July 20, 2009, Difilippantonio sent Kawa a letter summoning him to an investigation hearing, to be conducted pursuant to the SDR on July 31, 2009, to "determine your responsibility, if any, in connection with making false statements regarding your alleged incident and claim of injury to your back, neck, and head on July 6, 2009." (*Id.* ¶ 14). The investigation hearing was conducted by Assistant Division Engineer David A. Griffith. (*Id.* ¶ 15). Kawa attended the hearing, represented by his union representative Jack David, Vice Chairman, Affiliated Systems Federation. (*Id.*). Testimony concerning the circumstances of Kawa's alleged injury was given by Rich Klinkbeil, Division Engineer; Jim Barnard, Foreman; Ray Ransom, Trackman; John Carmona, Trackman; Difilippantonio, Assistant Division Engineer; and Kawa. (*Id.*). Klinkbeil testified at the hearing that he had been told by the seat manufacturer that, if tethers were used, they would stop the seat from going forward but that the type of vehicle Kawa was driving is not the type of vehicle in which tethers were needed. (NSR 56.1 Resp. ¶ 19). Hughes testifies at his deposition that the tether controls vertical movement. (*Id.* ¶ 24). Kerby testified at his deposition that he has not personally been aware of an NSR manager who did not tell the truth at an investigation hearing. (*Id.* ¶ 28).

Among the exhibits introduced by NSR at the investigation hearing was a written report prepared by Richard T. Hughes, P.E., a consulting engineer. (BMWED 56.1 Resp. ¶ 16). Hughes is an expert in kinetics and vehicular accident reconstruction. (NSR 56.1

Resp. ¶ 52). Hughes is not an expert in biomechanics or applied medicine. (*Id*.). Hughes has taken courses in accident reconstruction. (*Id*) Hughes is not a member of any accident reconstruction associations, holds no certificate from any organization as an accident reconstruction expert, has not published peer reviewed engineering research-based articles related to injuries received in low speed/low g force impact automobile or train accidents, and does not possess accident reconstruction analysis software. (*Id*.). NSR has used reports from Hughes at on-property disciplinary hearings in ten cases during the years 2009-2011. (*Id.* ¶ 9). Each of the employees who were the subject of those hearings was ultimately dismissed based on the totality of the evidence presented at their hearings and their appeals were subsequently denied. (*Id*.).

The Hughes report in the Kawa case set forth the results of tests that Hughes conducted based on his re-creation of the incident that allegedly injured Kawa. (BMWED 56.1 Resp. ¶ 16). Based on these tests, Hughes concluded that the injuries alleged by Kawa had "an extremely remote chance of occurring as described by him." (*Id*.).[6] NSR did not

---

[6]BMWED attempts to dispute the facts of how the Hughes evidence was used in the Kawa investigation. Its dispute is improper argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060. Furthermore, the record evidence that BMWED cites as support for its argument, the Supplemental Affidavit of Steven V. Powers, the Affidavit of Gary L. Cox, the Affidavit of Thomas Ray McCoy, and the Affidavit of Thomas J. Nameth, does not show that these Affiants have personal knowledge of, or are competent to testify to, these facts and therefore does not set out facts that would be admissible in evidence as required by Rule 56(c)(4) of the Federal Rules of Civil Procedure. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382. The evidence that NSR supplies as support for this fact, the Declaration of Dennis L. Kerby, adequately substantiates this fact.

inform Kawa or BMWED of the Hughes report prior to the investigation hearing. (NSR 56.1 Resp. ¶ 11). Hughes was not present at the hearing. (BMWED 56.1 Resp. ¶ 16). Kawa's BMWED representatives objected to entering the Hughes report into the record. (NSR 56.1 Resp. ¶ 13). Hughes was willing to testify for NSR live or by telephone. (*Id*. ¶ 14). David objected that without Hughes present, any statements by him would be unfair as David would not have an opportunity to question Hughes himself. (*Id*. ¶ 56). David asked NSR to make Hughes available for questioning, but was told he would not be available that day. (*Id*.). When David asked if it was possible to get Hughes there for the investigation and was told no, the hearing officer said that he could ask to take a recess and ask Hughes if he could attend, but never did. (*Id*) Kawa's BMWED representatives cross-examined NSR managers about the Hughes report, but the managers were unable to answer certain questions about the report's contents. (*Id*. ¶ 16).

Hughes reported that Kawa could not have hit his head on the roof of the truck because his re-enactment proved that there was one inch of clearance between Kawa's head and the roof in the critical 0.3 second of the occurrence. (*Id.* ¶ 17). Hughes reported that "[c]alculations on head collisions revealed that the amount of g's induced in Mr. Kawa's head if he did impact the ceiling would be six times below the dangerous limit." (*Id*. ¶ 18). Hughes reported that he based this conclusion on research done by R.W. Nightingale. (*Id*.). Nightingale's work involved measuring dropped cadavers to determine how much force

it takes to damage the cervical spine of a corpse. (*Id*. ¶ 35). Nightingale's work did not address cervical sprains or strains and he never concluded that a person cannot suffer cervical strains or sprains at a g force of less than 29. (*Id*.). Hughes's opinion are phrased "to a reasonable degree of engineering certainty," by which he means that he is 99% accurate. (*Id*. ¶ 21).

Kerby had some prior experience with Hughes. (*Id*. ¶ 40). In a case involving a different allegedly injured BMWED-represented employee, Terry Peters, Kerby wrote in an email that, "With respect to a charge of making false statements and conflicting statements concerning the report of an injury alleged to have occurred on August 5, 2009, the R.T. Hughes report on its face is lacking and needs further clarification before it could reliably constitute a compelling piece of evidence in a hearing." (*Id*.). Kerby specifically identified that one problem with Hughes's report in the Peters case was that Kerby could not access the Nightingale article referenced in the report. (*Id*. ¶ 41). Kerby also described at length the fact that a "g" is a unit of acceleration and not of force and that Hughes's report was confusing on the issue of the energy transferred to the respective objects and the resultant effects. (*Id*.). Kerby stated in an email that "if at the time of the discipline hearing, the only evidence that you have available to submit is this Hughes report in its current form, I doubt that with nothing more the report is deemed as substantial evidence of falsification. . ." (*Id*. ¶ 42). Kerby concluded that if Hughes provided further back-up

13

explanation for his methodology and conclusions, the report could constitute an acceptable exhibit in the Peters case. (*Id*.). Kerby did not inquire as to whether or not Hughes was qualified as an accident reconstruction expert other than by reading Hughes's credentials in his report. (*Id*. ¶ 61). Hughes offered to do some unofficial asking around to see if he could determine what Peters had been doing to fill his time while off of work due to his work-related injury because Hughes lives in the same town as the chiropractor who was treating Peters and was familiar with the town where Peters lived. (*Id*. ¶ 54).

Dr. Ziejewski, an expert in accident reconstruction, summarized the methodology used by Hughes in a January 6, 2011 letter to counsel for BMWED. (*Id*. ¶ 45). Hughes did not photograph the re-enactment to show the purported clearance. (*Id*. ¶ 46). Rather, Hughes determined the clearance between the top of Kawa's head and the ceiling of the truck by using a hand ruler. (*Id*. ¶ 47). Hughes knew that Kawa is 6'0" tall and weighs approximately 260 pounds. (*Id*. ¶ 49). Hughes did not know Kawa's posture, his pre-existing physical condition, or what part of his head made contact with the ceiling of the truck. (*Id*.). During Hughes's re-enactment, no one's head hit the ceiling despite the fact that in the actual incident the rear seat passenger did hit the roof. (*Id*. ¶¶ 49; 50).

On August 12, 2009, Griffith sent Kawa a letter stating, "As a result of the facts brought out in this formal investigation, you are hereby dismissed from all services with the Norfolk Southern Railroad Company." (BMWED 56.1 Resp. ¶ 17). On August 31, 2009,

14

David sent a letter to A.J. Licate, NSR's Director Labor Relations, appealing NSR's decision to dismiss Kawa pursuant to the appeal procedure in the SDR. (*Id*. ¶ 18).[7] In the appeal letter, David did not contend that NSR's introduction of the Hughes Report at the investigation hearing violated the SDR or otherwise objected to its receipt by the hearing officer. (*Id*.). David did not object to the fact that NSR had not given BMWED notice in advance of the hearing that it would introduce the report. (*Id*.). David did note that Hughes had not been present at the hearing and had not been available for questioning, but he did not argue that as a result the receipt of the Hughes report violated the SDR. (*Id*.). David merely asserted, "Since Mr. Hughes was not available for the Organization to question at the hearing, I can only assume that this exhibit 'G' [the report] will not have any bearing on the outcome of this investigation." (*Id*.). With the appeal letter, David included a written statement of August 28, 2009, by Tony Machetta, Service Manager of Old Dominion Truck Leasing. (*Id*.). The statement concerned the purpose of tether straps on air seats. (*Id*.). BMWED did not notify NSR that it would be submitting such a statement

---

[7]BMWED attempts to dispute the fact that the letter was not written like one by an attorney, and argues that NSR did not perform the duty required of it under the Act to undertake a fair and impartial effort to settle all disputes, including in the internal appeals process. Its dispute is improper argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060. Furthermore, the record evidence that BMWED cites as support for its argument, the Supplemental Affidavit of Steven V. Powers, does not show that Powers has personal knowledge of, or is competent to testify to, these facts and therefore does not set out facts that would be admissible in evidence as required by Rule 56(c)(4) of the Federal Rules of Civil Procedure. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382. The evidence that NSR supplies as support for this fact, the Declaration of Dennis L. Kerby, adequately substantiates this fact.

in advance of sending the appeal letter, nor did BMWED proffer Machetta for questioning. (*Id*.).

It was Kerby's responsibility, as Assistant Director Labor Relations, to prepare a response to the appeal submitted by BMWED on Kawa's behalf. (*Id*. ¶ 19). In preparing the response, Kerby reviewed for the first time the transcript from the July 6, 2009 disciplinary hearing, as well as the exhibits introduced into evidence at the hearing, including the Hughes report. (*Id*.). Prior to reviewing these materials in connection with responding to BMWED's appeal, Kerby had not formed any opinions concerning Kawa's alleged conduct. (*Id*.). Kerby only reviewed the evidence that was presented in the hearing transcript to determine whether it met the substantial evidence test. (NSR 56.1 Resp. ¶ 61). He did not take into account the possibility that local managers were retaliating against Kawa and the senior crew for their age or their complaints about safety. (*Id*.). On September 24, 2009, Kerby denied BMWED's appeal in a letter he sent to BMWED General Chairman T.R. McCoy, Jr. over the signature of Licate. (BMWED 56.1 Resp. ¶ 20). Because David did not allege in his appeal letter that submission or receipt of the Hughes report violated the SDR, Kerby did not address that subject in his letter denying the appeal. (*Id*.). On December 15, 2009, in accordance with the appeal procedure in the SDR, Kerby participated in a conference with David at which the appeal was discussed. (*Id*. ¶ 21).[8] The

_____

[8]BMWED attempts to characterize the conference and dispute that Kerby acted in good faith and fair dealing in accordance with a fair and impartial procedure. Its dispute is improper

parties were unable to resolve the dispute during the conference, so they agreed to submit the Kawa appeal to SBA No. 1048 for a final and binding arbitral decision. (*Id.*).

In accordance with standard practice and Section 6 of the SBA Agreement, both NSR and BMWED filled written *ex parte* submissions with SBA No. 1048, setting forth their respective positions on the Kawa matter. (*Id.* ¶ 22).[9] In its submission to the SBA, BMWED argued, "It is submitted that the Carrier has not presented a single shred of evidence, much less clear and convincing evidence, that Claimant Kawa gave any false information in connection with the incident or his injury." (*Id.* ¶ 23). BMWED argued in its appeal to the SBA that the Hughes report was "meaningless in this dispute" and should be given no weight for several reasons relating to alleged deficiencies in the way Hughes had conducted the re-enactment of the incident. (*Id.*). However, BMWED did not argue that NSR had violated Kawa's right to a fair and impartial investigation under the SDR by failing to provide BMWED with a copy of the Hughes report prior to, or by submitting it

---

argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060. Furthermore, BMWED does not point to admissible record evidence to support its characterization of the conference. An adequate submission of fact requires a citation to specific support in the record; an unsubstantiated submission is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001). The evidence that NSR supplies as support for this fact, the Declaration of Dennis L. Kerby and its Exhibit 10, adequately substantiates this fact.

[9]BMWED asserts that NSR omits to mention that Kerby and NSR did not reveal and disclaim the false and misleading evidence used to convict Kawa. This assertion is supported by nothing; it is pure argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060; *Alberio*, 246 F.3d at 933. The evidence that NSR supplies as support for this fact, the Declaration of Dennis L. Kerby and its Exhibits 11 and 12, adequately substantiates this fact.

at, the investigation or that the NSR hearing officer had violated Kawa's rights under the SDR by receiving the report. (*Id*.). Because BMWED did not make these assertions regarding the on-the-property handling of the Kawa appeal, NSR did not address these issues in its submission to the SBA. (*Id*.).[10]

On February 25, 2010, SBA No. 1048 met in Chicago for a hearing to discuss the issues in the Kawa appeal. (*Id*. ¶ 24). Kerby participated in that hearing as the Carrier Member of the Board. (*Id*.). BMWED's Public Law Board Coordinator, T.W. Kreke, participated as the Employee Member. (*Id*.). Hanft participated as the Chairman and the Neutral Member of the Board. (*Id*.). Kreke argued BMWED's position to Hanft, while Kerby argued NSR's position to Hanft. (*Id*.). On May 10, 2010, Hanft issued his proposed Award (SBA No. 1048, Award No. 185) in the Kawa matter, which became final under Section 11 of the SBA Agreement when it was signed by the other members of the Board on June 18, 2010. (*Id*. ¶ 25). The Board ruled, "We conclude that the finding on the property that Claimant made a false statement concerning an on-duty injury is supported by substantial evidence." (*Id*.). The Board reasoned that there was "no reason" to disturb

---

[10]BMWED attempts to dispute this fact. Its dispute is improper argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060. Furthermore, the record evidence that BMWED cites as support for its argument, the Supplemental Affidavit of Steven V. Powers, does not show that Powers has personal knowledge of, or is competent to testify to, these facts and therefore does not set out facts that would be admissible in evidence as required by Rule 56(c)(4) of the Federal Rules of Civil Procedure. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382. The evidence that NSR supplies as support for this fact, the Declaration of Dennis L. Kerby, adequately substantiates this fact.

the "credibility determinations" made by Kawa's NSR managers that Kawa "did not

impact the truck ceiling as reported" because "[a]s an appellate body, we are in a very poor

position to assess the relative credibility of the witnesses." (NSR 56.1 Resp. ¶ 26). The

Board upheld the punishment of dismissal, stating, "falsifying a claim of an on-duty injury

is a very serious offense that generally warrants dismissal. In the record presented, we

cannot say that the penalty assessed was arbitrary, capricious or excessive. Thus, the claim

is denied." (BMWED 56.1 Resp. ¶ 25).[11] Because BMWED had not argued in its submission

to the SBA that NSR's failure to provide it with a copy of the Hughes report to, or NSR's

submission of the report at, the investigation hearing or that the receipt of the report by the

hearing officer had violated Kawa's rights under the SDR or otherwise, the Award did not

address this issue. (*Id*. ¶ 26).[12]

On August 26, 2010, three and one-half months after the Kawa Award became final,

---

[11]BMWED attempts to dispute the fact that it agreed with the finding of the Neutral Member and asserts that it objected to the use of the term "we" in the Award. BMWED does not cite any record evidence for support of this statement. An adequate denial of fact requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero*, 246 F.3d at 933. The evidence that NSR supplies as support for this fact, the Declaration of Dennis L. Kerby and its Exhibit 13, adequately substantiates this fact.

[12]BMWED attempts to dispute this fact. Its dispute is improper argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060. Furthermore, the record evidence that BMWED cites as support for its argument, the Supplemental Affidavit of Steven V. Powers, does not show that Powers has personal knowledge of, or is competent to testify to, these facts and therefore does not set out facts that would be admissible in evidence as required by Rule 56(c)(4) of the Federal Rules of Civil Procedure. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382. The evidence that NSR supplies as support for this fact, the Declaration of Dennis L. Kerby and its Exhibit 13, adequately substantiates this fact.

BMWED's Board member submitted a Dissent to Award 185. (*Id.* ¶ 27). In this dissent, BMWED argued for the first time that the Hughes report "was a travesty of both procedural and substantive due process." (*Id.*). In particular, BMWED argued for the first time:

> Finally, the junk science opinion paper submitted by the so-called expert was presented at the hearing as naked hearsay. That is, over the vociferous objection of the Union, the hearing officer allowed the Carrier to enter the opinion paper into the record even though its author was not present for cross-examination as to his credentials or methodology. And, to make matters worse, the Carrier failed to even inform the Union of the existence of the opinion paper, much less provide a copy, in advance of the hearing. This was a blatant case of prosecution by ambush and any fair reading of the transcript establishes that the Claimant did not receive a fair and impartial investigation. (*Id.*)

On September 21, 2010, Kerby responded to the Dissent to Award 185. (*Id.* ¶ 28). In particular he responded to BMWED's assertion that NSR had deprived Kawa of a fair and impartial hearing with respect to the Hughes report. (*Id.*). Kerby wrote:

> The Dissent's discouraging remarks regarding the allowing into the record or giving any consideration to the testimony of the reenactment or the expert witness submission is contrary to the accepted standards. Hearing Officers typically allow all reasonable efforts to establish the facts – such material is accepted into the record and afforded whatever weight is appropriate based on the character and reliability of the information. The reenactment, while not necessarily definitive standing on its own, was of some relevance with respect to the possibility of the incident occurring as alleged, just as were details regarding the type of seat in the Gang Truck, whether it had been properly installed, its position and whether the Claimant wore his seatbelt. The expert witness submission was merely a documentation of all these details. The Board did not accept that information in a vacuum; rather it weighed that evidence along with all of the other, including the eye-witness

statement that the Claimant's head did not hit the ceiling of the truck versus the Claimant's report that he "jammed" his head against the ceiling. (*Id.*).

The NSR-BMWED SDR does not contain any requirement that either NSR or the Union notify the other in advance of a disciplinary investigation hearing when that party intends to introduce written statements from third parties or reports from experts at the hearing. (*Id.* ¶ 29). Nor does it contain any requirement that such written statements or expert reports be provided in advance of the hearing. (*Id.*). The SDR does not provide for any pre-hearing discovery. (*Id.*). Nor are any such requirements set forth in any other collective bargaining agreements between NSR and BMWED. (*Id.*).[13] The NSR-BMWED SDR does not prescribe any rules concerning the nature, type, or form of evidence that may be submitted by either party or received by the hearing officer at a disciplinary investigation hearing. (*Id.* ¶ 30). In particular, the SDR does not prohibit the submission or receipt of hearsay evidence. (*Id.*). Nor does the SDR require that evidence may be received only from witnesses who are present at the hearing and can be subjected to questioning. (*Id.*). Nor are any such requirements set forth in any other collective bargaining agreements between NSR and BMWED. (*Id.*). NSR and its predecessor railroads and BMWED and its predecessor unions repeatedly have presented expert

---

[13]BMWED asserts that these rights are implied in the CBA as a matter of contractual due process and the RLA's guarantee of due process and fair and impartial hearings. BMWED does not cite any record evidence in support of its contention; it is pure argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060; *Alberio*, 246 F.3d at 933

reports and other written witness statements at investigation hearings without providing copies of such reports and statements to the other party in advance of the hearings and without bringing the authors of those reports or statements to the hearings, where they could be subjected to questioning. (*Id.* ¶ 31). There are several examples of NSR and BMWED engaging in investigations and appeals in which reports were presented without live testimony, expert evidence was received without the expert being present, and evidence was submitted based on statements where the author of the statement was not made available for questioning. (*Id.* ¶¶ 31-33).

NSR's investigation of Kawa has not been the only time NSR has presented a written report from Hughes at a disciplinary investigation hearing. (*Id.* ¶ 34). NSR conducted an investigation hearing to determine whether BMWED-represented employee A.D. Gibson had made false and conflicting statements concerning how he had sustained an alleged on-duty injury. (*Id.*). NSR introduced a written report from Hughes at the on-the-property hearing in which Hughes concluded that the injury could not have happened as Gibson had reported. (*Id.*). NSR dismissed Gibson from service, and BMWED filed an appeal. (*Id.*). In contrast to BMWED's failure to do so in the Kawa case, in its submission to SBA No. 1049 BMWED expressly objected to the receipt of the Hughes report, arguing, "The problem here is that although the accuracy of the test report was challenged during the investigation, Mr. Hughes was not available for cross examination." (*Id.*). The SBA upheld

the dismissal in Award No. 193.  In particular, the SBA approved NSR's decision to credit

the Hughes report in making its disciplinary decision:

> We further defer to the decision on the property to credit the consulting
> engineer's forensic report.  Although the Organization questioned some of
> the assumptions made by the consulting engineer, such as the assumption
> that the Claimant did not report any pain or discomfort on the day of the
> incident, we find the overall conclusion and several key bases for that
> conclusion, such as the absence of damage to the hard hat and the
> inconsistency between a blow to the hard hat and the diagnosis of cervical
> strain, to be unrefuted.  We conclude that Carrier proved the charge by
> substantial evidence.  (*Id*.).[14]

BMWED has also submitted written expert reports at disciplinary investigation hearings

without giving NSR advance notice or copies of the report and without bringing the

witness to the hearing for questioning.  (*Id*. ¶ 35).  NSR has presented written reports from

accident reconstruction experts in investigation hearings involving members of other

unions that represent its employees without presenting live testimony from such experts.

(*Id*. ¶ 36).  The unions that represent other crafts and classes of NSR employees also have

presented written expert witness reports at disciplinary investigation hearings without

bringing the authors of those reports to the hearings for questioning or without giving

NSR notice that such evidence would be presented or pre-hearing discovery of such

---

[14]BMWED attempts to discredit this SBA Award and the approval of Hughes by the Board.  Its dispute is improper argument and conjecture.  *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060.  The evidence that NSR supplies as support for this fact, the Declaration of Dennis L. Kerby and its Exhibits 20 and 21, adequately substantiates this fact.

reports. (*Id.* ¶ 38).

There is no provision in the NSR-BMWED SDR entitling either NSR or BMWED to pre-hearing discovery of the evidence to be submitted at a disciplinary investigation hearing or obligating either party to give notice to the other of the evidence it intends to submit. (*Id.* ¶ 40).[15] Railway Labor Act arbitration boards have repeatedly ruled that there is no right to "discovery" prior to disciplinary investigation hearings in the absence of a contractual provision granting such a right. (*Id.* ¶ 41). There have been numerous awards so holding in cases involving NSR and its predecessor railroads. (*Id.*). Arbitrators have similarly so ruled in cases involving BMWED and other carriers. (*Id.* ¶ 42). Railway Labor Act arbitration boards have repeatedly ruled in decisions going back decades that hearsay evidence may be submitted and received in on-the-property disciplinary investigation hearings in the rail industry, including in cases involving BMWED and NSR and its predecessors. (*Id.* ¶ 44). Nothing in the NSR-BMWED SDR prohibits the submission or receipt of hearsay evidence in disciplinary investigation hearings. (*Id.* ¶ 47).

On March 21, 2011, Steven Powers, BMWED's Director of Arbitration, submitted a memorandum to Sherrill Benjamin, OSHA Whistleblower Program Manager, concerning

---

[15]BMWED asserts that these rights are implied in the CBA as a matter of contractual due process and the RLA's guarantee of due process and fair and impartial hearings. BMWED does not cite any record evidence in support of its contention; it is pure argument and conjecture. *See Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060; *Alberio*, 246 F.3d at 933.

the procedures for disciplinary investigation hearings in the rail industry under the collective bargaining agreements between BMWED and the railroads, including NSR. (*Id*. ¶ 48). BMWED attached a copy of the NSR-BMWED SDR to the Powers Memorandum as "[a]n example of a typical railroad industry discipline rule." (*Id*.). In the Powers Memorandum, BMWED admitted that rail industry arbitration boards routinely have held that the contractual right to a "fair and impartial hearing," such as that found in the NSR-BMWED SDR, does not require a railroad to provide discovery or witness lists in advance of disciplinary hearings. (*Id.* ¶ 49). In the Powers Memorandum, BMWED admitted that rail industry arbitration boards routinely have held that the contractual right to a "fair and impartial hearing," such as that found in the NSR-BMWED SDR, does not preclude the receipt of hearsay evidence at disciplinary hearings. (*Id.* ¶ 50). In the Powers Memorandum, BMWED admitted that "the courts have also made it clear that the Railway Labor Act does not prescribe due process procedures for conducting a hearing on the railroad property. *Edwards v. St. Louis-San Francisco Railroad Co.*, 361 F.2d 946 (7th Cir. 1966); *Brooks v. Chicago, Rock Island and Pacific Railroad Co.*, 177 F.2d 385 (8th Cir. 1994). Thus, the quantum and quality of due process at the disciplinary hearing is governed by the collective bargaining agreement, that is, that which the union was able to bargain in a forum, collective bargaining, where compromise is inherent." (*Id.* ¶ 51).

BMWED alleges in paragraph 38 of its First Amended Petition that, in his role as

NSR's partisan member of SBA No. 1048, Kerby was obligated to disclose to the other Board members what he "knew or suspected" concerning the veracity of the Hughes report submitted at the Kawa disciplinary hearing. (*Id*. ¶ 52). Kerby reviewed the Hughes report in the Kawa case for the first time in connection with preparing NSR's response to BMWED's appeal of Kawa's dismissal. (*Id*.). The Hughes report described in detail the re-enactment that Hughes conducted and the calculations that led him to conclude that Kawa's head had come no closer than "an inch of the ceiling if he had his seat belt on." (*Id*.). Kerby saw nothing in the Hughes report that caused him to question whether Hughes's statements in that report were made in good faith or to question the honesty of the opinions he expressed concerning Kawa. (*Id*.). Kerby had no basis for concluding that Hughes's report was in any way false or fraudulent or that it would be necessary for Kerby to conduct any additional inquiries concerning Hughes or his Kawa report. (*Id*.)

BMWED alleges in paragraph 39 of its First Amended Petition that Kerby's "multiple roles violated the RLA, the CBA, and other legal protections afforded Kawa." (*Id*. ¶ 53). SBA No. 1048 is a special board of arbitration that NSR and BMWED are authorized to create by Section 3 Second (second para.) of the Railway Labor Act, 45 U.S.C. § 153 Second (second para.). (*Id*.). Nothing in the NSR-BMWED SDR prescribes or limits in any way who NSR and BMWED can select to serve as their partisan members on the SBA created to resolve disputes over disciplinary matters. (*Id*.). Finally, nothing in the SBA

Agreement establishing SBA No. 1048 prescribes or limits in any way who NSR and BMWED can select to serve as their partisan members on the SBA. (*Id.*). Kerby has served as NSR's partisan member on several SBAs during his tenure at NSR. (*Id.* ¶ 54). In no instance has BMWED ever objected to his service even though he frequently has been the NSR Labor Relations officer involved in prior proceedings involving employee discipline. (*Id.*). BMWED never objected to Kerby's service as a partisan Board member in the Kawa case, even though BMWED was well-aware that he had been the NSR official who denied BMWED's appeal from Kawa's dismissal. (*Id.*).

## II.  The Standard of Review

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704 (7th Cir. 2011); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). When a case comes before the Court on cross-motions for summary judgment, the Court must look to the burden of proof that each party would bear on an issue at trial and then require that party

to go beyond the pleadings and establish through competent evidence a genuine issue of

material fact. *See Santella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing

*Celotex*, 477 U.S. at 324). However, on summary judgment the Court will limits its analysis

of the facts to the evidence that is supported by the parties' Local Rule 56.1 statements

properly before the Court. *See F.T.C. v. Bay Area Business Council, Inc.*, 423 F.3d 627, 634

(7th Cir. 2005); *Bordelon v. Chicago Sch. Reform Bd. of Tr.*, 233 F.3d 524, 529 (7th Cir. 2000).

When a proposed statement of fact is supported by the record and not adequately

controverted by the opposing party, the Court will accept that statement as true. *See*

*Alberio v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001). To adequately dispute a

statement of fact, the opposing party must cite to specific support in the record; an

unsubstantiated denial or a denial that is mere argument or conjecture is not sufficient to

create a genuinely disputed issue of material fact. *See Id; see also Judson Atkinson Candies,*

*Inc.*, 529 F.3d at 382 n. 2; *Cady*, 467 F.3d at 1060. Factual disputes "are genuine only if the

evidence is such that a reasonable jury could return a verdict for the nonmovant." *CAE,*

*Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 676 (7th Cir. 2001) (quoting *Anderson*, 477

U.S. at 248) (internal quotations and citations omitted). The existence of a materially

disputed issue of fact will be sufficient to avoid summary judgment only if the disputed

fact is determinative of the outcome under the applicable law. *See Montgomery v. American*

*Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010); *Tyler v. Runyon*, 70 F.3d 450, 464 (7th Cir.

28

1995).

## III. Discussion

In BMWED's first two Causes of Action alleged in its Amended Petition, BMWED claims that NSR's submission at its on-property disciplinary hearing of the Hughes accident reconstruction report was "a radical departure for the usual manner of handling grievances" and that the SBA violated RLA § 3 First (i), 45 U.S.C. § 154 First (i), and Kawa's "contractual due process rights" when it upheld his dismissal. BMWED did not move for summary judgment on these claims and does not refer to these claims in its memorandum of law in support of its Motion for Summary Judgment. NSR did address these claims in its Cross-Motion for Summary Judgment, arguing that, as a matter of law, judgment should be entered in its favor on these Causes of Action. BMWED did not respond to NSR's arguments. Thus, BMWED has abandoned these claims by not responding to NSR's Motion for Summary Judgment and by not arguing that judgment should be entered in its favor as a matter of law. *See Mach v. Will County Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009) (stating that a plaintiff may abandon claims on summary judgment by determining that the claim "is no longer worth presenting"); *Palmer v. Marion County*, 327 F.3d 588, 597-598 (7th Cir. 2003) (failure to delineate a claim in a brief to the district court in opposition to summary judgment results in abandonment of that claim); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented to the

court in response to summary judgement motions are waived). BMWED attempts to rescue these claims in its reply brief in support of its Motion for Summary Judgment, arguing that it never abandoned these claims. The Petitioner cannot lull the Respondent into forgoing legal arguments against the Petitioner's claims by failing to respond to them in its responsive brief, and then reasserting them in a reply brief to which the Respondent does not get an opportunity to respond. Such a ploy will not be tolerated by this Court. The Court therefore grants summary judgment to NSR on BMWED's First and Second Causes of Action because BMWED had an opportunity to respond to NSR's arguments made in its Motion for Summary Judgment but failed to do so. *See Celotex Corp.*, 477 U.S. at 326; *Smith v. De Bartoli*, 769 F.2d 451, 452 (7th Cir. 1985).

BMWED bases its Motion for Summary Judgment solely on two claims that it raised in its Third Cause of Action. First, the Union argues that the fact that Kerby played several "roles" in connection with the Kawa dispute "violated the RLA" and that "Kerby's failure to act fairly and impartially in his various roles is, by itself, grounds under the RLA for setting aside and remanding this case to the SBA." Second, BMWED alleges that Kerby, as a member of the SBA, engaged in "fraud or corruption" because he allegedly knew that the Hughes report "was both fraudulent and baseless" and failed to share that knowledge with the other members of the SBA. Alternatively, the Union argues that Kerby had an affirmative duty to make an inquiry concerning Hughes's qualifications and conclusions

and to share the results of such an inquiry with the other members of the SBA. In its response to NSR's Motion for Summary Judgment, BMWED does not address their first claim raised in their Third Cause of Action, namely that Kerby's playing multiple "roles" in the Kawa affair "violated the RLA" and that "Kerby's failure to act fairly and impartially in his various roles is, by itself, grounds under the RLA for setting aside and remanding this case to the SBA." Arguments not made in responsive briefs to summary judgment are waived. *See Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 876 (7th Cir.2008) (undeveloped argument constitutes waiver); *Palmer*, 327 F.3d at 597-598 (failure to delineate a claim in a brief to the district court in opposition to summary judgment results in abandonment of that claim); *Laborers' Int'l Union of N. Am.*, 197 F.3d at 1197 (stating that arguments not presented to the district court in response to summary judgement motions are waived). BMWED has therefore abandoned and waived this claim by not responding to NSR's arguments with respect to it. Thus, the only question is whether Kerby, as a member of the SBA, engaged in "fraud or corruption" within the meaning of the Act because he allegedly knew that the Hughes report "was both fraudulent and baseless" and failed to share that knowledge with the other members of the SBA, or alternatively, was derelict in an alleged duty to inquire into Hughes's qualifications and conclusions and to share the results of such an inquiry with the other members of the SBA.

As the Supreme Court has emphasized, "the scope of judicial review of Adjustment

Board decisions is among the narrowest known to the law." *Union Pac. R.R.*, 439 U.S. at 90.

BMWED alleges that the Hughes report that was submitted by local NSR management at

Kawa's on-property disciplinary hearing was "both fraudulent and baseless." BMWED

challenges Hughes's credentials, the opinions he expressed, and the methodology he used.

The Union has submitted affidavits from other accident reconstruction professionals who

have reviewed Hughes's work and dispute it. This evidence only goes so far as to establish

the weight that the hearing officer should have afforded the Hughes report. Weighing the

evidence is "exactly the type of determination that Congress intended to be left to the

Adjustment Board *without judicial review*." *Kotakis v. Elgin, J. & E. Ry.*, 520 F.2d 570, 575 (7th

Cir. 1975) (emphasis supplied). "The sufficiency of the evidence comprising the foundation

of the Board's decision is not reviewable." *Anderson v. Nat'l R.R. Passenger Corp.*, 754 F.2d

202, 204 (7th Cir. 1984); *see also Pokuta v. Elgin, J. & E. Ry.*, 520 F.2d 570, 575 (7th Cir. 1999)

(argument that RLA Board incorrectly weighed the evidence improperly "exceeds the

narrow scope of our review"). Thus, the disagreements over the evidence does not

establish the existence of a materially disputed issue of fact and the Court cannot conclude

that as a matter of law Hughes's work was fraudulent. While fraud can be readily averred,

it cannot be so readily proved. To prove fraud requires a showing "by clear and

convincing evidence that (1) the defendant made a false statement of material fact; (2) the

defendant knew that the statement was false; (3) the defendant intended that the statement

induce plaintiff to act; (4) the plaintiff justifiably relied upon the statement's truth; and (5) the plaintiff suffered damages as a result of relying on the statement." *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 413 (7th Cir. 2009). Furthermore, the courts have ruled that "[a] finding of fraud under the RLA demands a greater level of improper conduct than the common law level to establish fraud. Because of the strong federal policy favoring arbitration, fraud can only be established through clear and convincing proof of an extremely high degree of improper conduct such as dishonesty." *Goff v. Dakota, M. & E. R.R.*, 170 F. Supp. 2d 912, 921 (D. S.D. 2000) *rev'd on other grounds*, 276 F.3d 992 (8th Cir. 2002) (quoting *Pacific & A. Ry. v. United Transp. Union*, 952 F.2d 1144, 1147 (9th Cir. 1991)) (internal quotations omitted). BMWED has made no such showing in this case. Therefore its Motion for Summary Judgment must be denied.

Even if BMWED could prove that the Hughes report was fraudulent, there is still no basis for setting aside the SBA's arbitration Award. RLA § 3 First (q) authorizes a federal court to set aside an RLA arbitration award for "fraud or corruption by a member of the [Board] making the order." 45 U.S.C. § 153 First (q). The fraud which a petitioner alleges occurred must be fraud by the Board member in connection with the SBA proceedings. *See Steffens v. Bro. Ry., A. & SS Clerks*, 797 F.2d 442, 448 (7th Cir. 1986) ("The statute requires an allegation of fraud or corruption 'by a member of the division making the order'"). Allegations of fraud by a party to the arbitration, including allegations that

33

fraudulent evidence was admitted during on-property disciplinary hearings, are insufficient to support setting aside a Board's arbitral award. *See, e.g., Mitchell v. Union Pac. R.R.*, No. 05 C 3834, 2006 WL 756069, *2 (N.D. Ill. March 22, 2006), *app. dismissed*, 501 F.3d 794 (7th Cir. 2007) ("Section 153 permits the Court to set aside an NRAB award for fraud, but only if the fraud was committed 'by a member of the [NRAB] division making the order.'"); *Hankin v. National R.R. Pass. Corp.*, No. 86 C 7233, 1987 WL 20136, *5 (N.D. Ill. Nov. 16, 1987) (Williams, J.) ("the fraud must occur in the Board proceeding itself."); *Pitts v. National R.R. Pass. Corp.*, 603 F. Supp. 1509 (N.D. Ill. 1985) (misconduct was not held to be fraud within the meaning of the RLA "because it is not by a board member"). A federal court may not vacate an arbitration award even when a party allegedly submits false or even fraudulent evidence at its on-property hearings. *See, e.g., Holmes v. Nat'l R.R. Passenger Corp.*, No. CIV. A. 94-7723, 1995 WL 334334, *8 (E.D. Pa. June 1, 1995). Nor can a federal court vacate an arbitration award where a party makes misrepresentations in its written pre-hearing submissions to the Board. *See Merchants Despatch Transp. Corp. v. System Fed. No. One*, 447 F. Supp. 799, 803-804 (N.D. Ill. 1978). The body with the authority to remedy such alleged misconduct is the RLA arbitration board itself. The Seventh Circuit long ago held this to be the case in *Edwards v. St. Louis-S F.R. Co.*, 361 F.2d 946, 952 (7th Cir. 1966), stating that a terminated employee "cannot come before this or the district court complaining that the award of the Railroad Adjustment Board was based on insufficient

evidence." As discussed above, the Seventh Circuit has repeatedly held that weighing the evidence submitted at an on-property hearing is a determination that Congress intended to be left with the arbitral Boards, without the intervention of judicial review or scrutiny. *See Pokuta*, 191 F.3d at 841; *Anderson*, 754 F.2d at 204; *Kotakis*, 520 F.2d at 575.

In *Holmes*, 1995 WL 334334, *8, the petitioner seeking to have an arbitration award vacated alleged that a witness at the disciplinary hearing had been coerced by railroad managers into making a false statement. The petitioner in that case even submitted a declaration from the witness in which the witness described her testimony as "all lies." *Id.* The court rejected that this conduct constituted "fraud" sufficient to justify vacating the award, stating, "Section 153 clearly states that the fraud involved must be fraud 'by a member of the division making the order.' This can only mean fraud by a member of the Board itself. The statute and the established law are clear on this point." *Id.* (citing *DeClara v. Metropolitan Transportation Authority*, 748 F. Supp. 92, 95 (S.D. N.Y. 1990); *Pitts*, 603 F. Supp. at 1517) (internal citations omitted). In *Merchants Despatch Transp. Corp*, 447 F. Supp. at 803-804, a court in this District rejected the petitioner's argument that an award favorable to the union should be set aside because of misrepresentations made by the union in its written submission to the arbitration board. The court held that to state a claim for fraud sufficient to reverse an award by the arbitration board the fraud or corruption must be by a member of the board. *See Id*. The court stated, "[the Petitioner] claims fraud by a party

35

to the proceedings; nowhere in the complaint is there any indication of fraud on the part of any of the members of the Board." *Id.*

Here, BMWED has not set forth any evidence that Kerby engaged in any fraudulent conduct when acting as a member of SBA No. 1048. The Union does not offer evidence of any false or misleading statements by Kerby to the other Board members. BMWED has no evidence to prove that Kerby had the requisite intent to mislead the neutral Board member. BMWED relies on a case from the District Court of South Dakota, *Goff*, 170 F. Supp. 2d at 921 (D. S.D. 2000), *rev'd on other grounds*, 276 F.3d 992 (8th Cir. 2002), as support for the proposition that fraud can be inferred where a carrier representative knowingly fails to disclose that perjured testimony is being offered to a Board and knowingly intends to deceive the neutral Board member. In that case, the court found that by shrugging his shoulders in response to a question from the neutral member of the Board concerning the identity of the carrier official who had ordered a drug test, the carrier member "intended to deceive the neutral and fundamentally induce him into believing that he did not know who ordered the tests." *Id.* There are no similar facts in the present case.

BMWED also argues that an RLA award may be set aside whenever allegedly perjured testimony is included in the record submitted to the SBA. To support this proposition BMWED relies on language in *Pitts*, 603 F.Supp. at 1517, where the court observed that *Woodrum v. Southern Ry. Co.*, 750 F.2d 876, 882 (11th Cir. 1985), "suggests if

36

the carrier representative knows and fails to disclose that perjured testimony is being offered before the board, then that is fraud within § 153 First (q)." This language is not applicable to the present case. The language from *Pitts* on which BMWED so heavily relies refers to the giving of perjured testimony in an evidentiary hearing conducted *before the Board itself*, not evidence introduced at a prior on-property hearing that was simply included in the record before the Board on appeal. The court in *Pitts* made exactly this distinction, stating that "[h]ere, however, none of the alleged improper practices took place before the Board itself." *Pitts*, 603 F. Supp at 1517 n.1.

BMWED cannot argue that Kerby affirmatively engaged in any fraudulent activity with respect to the Hughes report that NSR submitted at Kawa's on-property hearing. It is undisputed that Kerby did not see the Hughes report prior to Kawa's dismissal. Kerby saw it for the first time as part of the post-discharge appeals process. Kerby saw nothing in the Hughes Kawa report that caused him to question whether Hughes's statements in the report were made in good faith or to question the honesty of the opinions Hughes expressed regarding Kawa. Kerby had no basis for concluding that Hughes's report was false or fraudulent or that it was necessary for Kerby to conduct additional inquiries concerning Hughes or his report.

What the Union is essentially arguing is that Kerby had a duty to inform the SBA of the comments and suggestions that he had made to NSR managers following his review

of an *early draft* of a *different* Hughes report in connection with an alleged injury suffered

by a *different* NSR employee, Terry Peters. BMWED's argument that, as a result of Kerby's

review of the draft Peters report, he "knew" that Hughes's Kawa report was "fraudulent

and baseless" is not supported by the evidence in this case. In fact, Kerby indicated that

the Peters report "needs further clarification before it could reliably constitute a compelling

piece of evidence in a hearing." Thus, Kerby indicated that with further clarification the

report would be of use and benefit to NSR as a compelling piece of evidence. He observed

that "Hughes providing further back up explanation for his methodology and conclusions

could result in an acceptable exhibit. Having a structural analysis of the magnitude of the

impact and being able to relate it to a medical study of impact injuries on the neck and

spine is definitely a valuable approach. . ." Thus, contrary to BMWED's position that Kerby

had knowledge that Hughes lacked qualifications and that his report was fraudulent or

baseless, Kerby affirmatively stated that the Hughes report in the Peters case could act as

a valuable piece of evidence if some modifications were made by Hughes himself.

BMWED cites no authority for the proposition that a partisan member of an RLA

arbitration board has an enforceable duty to make a full disclosure of any exculpatory

evidence or anything else known to him that might possibly weaken the position of the

party that appointed him. Nor does the union cite any authority for the proposition that

a partisan member of a board commits a fraud if he fails to make such a disclosure

38

sufficient to empower a federal court to set aside an arbitration award. As the Seventh Circuit has repeatedly held, "party-appointed arbitrators are *supposed* to be advocates. In labor arbitration a union may name as its arbitrator the business manager of the local, and the employer its vice-president for labor relations. Yet no one believes that the predictable loyalty of these designees spoils the award." *Sphere Drake Ins., Ltd. v. All American Life Ins. Co.*, 307 F.3d 617, 620 (7th Cir. 2002) (emphasis in original); *see also Arnold v. United Air Lines Inc.*, 296 F.2d 191, 195 (7th Cir. 1961) ("Members of such boards are not in legal contemplation, or in fact, supposed to be neutral arbitrators."); *Henry v. Delta Airlines*, 759 F.2d 870, 872 (7th Cir. 1985) (same). In reality, it is the neutral member of the Board who decides the case. *See United Transp. Union v. Gateway W. Ry. Co.*, 284 F.3d 710, 711 (7th Cir. 2002) ("since the party members of the panel are expected to vote in accordance with their principals' wishes...it is the neutral who is the real 'judge' and usually decides the case.").

Rail carriers and unions are authorized to establish SBAs by the RLA, 45 U.S.C. § 153 Second (second para.). The statute provides that the SBA "shall consist of one person designated by the carrier and one person designated by the representative of the employee," in addition to "a neutral person." 45 U.S.C. § 153 Second (second para.). The statute does not place any restrictions on whom the parties may choose as their representatives. Likewise, the collective bargaining agreements between NSR and BMWED place no restrictions on whom the parties may select as their partisan representatives on

the Board. The SDR Agreement simply states that "[a] special board of adjustments shall be established with jurisdiction over such disputes involving disciplinary matters." It does not define or place any restrictions on who may serve on the Board. SBA No. 1048 was created in a March 22, 1991 Agreement between an NSR predecessor and BMWED. The Agreement similarly places no restrictions on whom the parties may select as their members of the Board.

BMWED's argument that Kerby's prior involvement in Kawa's disciplinary proceedings somehow constituted "fraud and corruption" has been squarely rejected by the courts. In *Hankin*, 1987 WL 20136, *2-3, a court in this District rejected the argument that the carrier's partisan member had committed "fraud or corruption" because he had conducted the appeal conference that had denied the plaintiff's appeal and as a result "knew the case." Quoting *Arnold*, 296 F.2d at 195, the *Harkin* court concluded that "[t]his in itself is little consequence because members of such boards are not in legal contemplation, or in fact, supposed to be neutral arbitrators." 1987 WL 20136, *2-3 (internal citations and quotations omitted); s*ee also Brown v. Trans World Airlines, Inc.*, 569 F. Supp. 247, 252 (W.D. Mo. 1983) *aff'd,* 746 F.2d 1354 (8th Cir. 1984) (the fact that the employer's partisan member had participated in the plaintiff's termination decision did not constitute fraud or corruption within the meaning of the RLA).

BMWED's alternative argument, that Kerby had an obligation to disclose whatever

40

he knew about Hughes or conduct an investigation into his work because of alleged errors in his Kawa report, does not have any merit. First, BMWED cannot point to any evidence to show that Kerby was aware of any false or fraudulent statements in Hughes's Kawa report. Even if BMWED could show that Kerby was aware of such false or erroneous conclusions in the report, he had no obligation to disclose that information to the Board. In *Pitts*, 603 F. Supp. at 1517-1518, a court in this District held that where the petitioner alleges that the employer member of the Board knows of improper disciplinary practices by lower management and fails to disclose this information to the other Board members, failing to disclose such knowledge is not "fraud or corruption" within the meaning of the RLA. The court explained that extrinsic fraud is fraud not preventable by the parties themselves, such as where one party obtains a favorable result by bribing the judge. *See Id.* Such extrinsic fraud is the kind of "fraud" contemplated by the RLA as grounds for vacating an arbitration award. *See Id.* On the other hand, intrinsic fraud, which is not "fraud" within the meaning of the Act, is exemplified by perjured testimony or misrepresentations by counsel. *See Id.* The court in *Pitts* held that if the employer member of the Board fails to disclose information to the other members of the Board of improper disciplinary practices such fraud is intrinsic and therefore not "fraud" within the meaning of the RLA. *See Id.*

The court in *Hankin* followed *Pitts*, and held that where the employer Board member

41

fails to inform the other Board members about deficiencies in the on-property disciplinary hearing that led to a petitioner's termination, such fraud was of an intrinsic nature and thus not grounds for setting aside an arbitration award. *Hankin*, 1987 WL 20136, *5. The court stated, "the fraud must occur in the Board proceeding itself. In this case, the type of fraud, to the extent there is any at all, is of the intrinsic variety. The plaintiff could have brought the deficiencies and alleged unfairness in the lower proceedings to the Board's attention. Thus, the carrier representative's failure to inform the Board of the inadequacies of the lower court proceeding is not 'fraud or corruption' for purposes of review under the Act." *Id.* The rule that only evidence of extrinsic fraud can provide a basis for challenging an arbitration award under RLA § 3 First (q) finds support in nationwide caselaw. *See Goff*, 170 F. Supp. 2d at 921-922 (stating that the only type of fraud that will enable a district court to set aside an arbitration award is extrinsic fraud); *Zurawski v. Southeastern Pennsylvania Transp. Authority*, No. 08 C 05040, 2010 WL 1946922, *7-8 (E.D. Pa. May 10, 2010) ("The type of fraud contemplated by the RLA is the so-called 'extrinsic' fraud that will cause the innocent party to lose regardless of its argument because the case is not decided on its merits.").

BMWED's allegations that the Hughes report contained false or fraudulent conclusions is not a basis on which to set aside the Board's Award under the Act. Here, the submission of allegedly fraudulent evidence occurred at the hearing on the NSR property,

42

not before the Board. Furthermore, the alleged misconduct was committed by lower level NSR managers who submitted the evidence, not by SBA member Kerby. Thus, this is at most a case of intrinsic, rather than extrinsic, fraud—if it is a case of fraud at all, something that BMWED has not proven by clear and convincing evidence. BMWED even brought the alleged deficiencies in the Hughes report to the attention of the Board in its written submission, arguing that the report should be afforded no weight by the Board in making its final determination. Thus, the Petitioner had the opportunity to point out the deficiencies in the proceedings below and attempted to influence the Board to give no weight to the Hughes report. As a matter of law, Kerby's alleged failure to disclose any alleged deficiencies in the Hughes report or to conduct an independent investigation into Hughes's conclusions is not "fraud or corruption" within the meaning of RLA § 3 First (q). BMWED has not set forth any evidence demonstrating that the SBA's Kawa Award can be set aside under the narrow standard of review in RLA § 3 First (q). For these reasons, the Board's conclusion is afforded the deference that is due to it and the Court will not vacate or set aside the Board's Award.

## IV. Conclusion

For the reasons set forth above, the Brotherhood of Maintenance of Way Employees Division/IBT's Motion for Summary Judgment is denied. Norfolk Southern Railway Company's Motion for Summary Judgment is granted. The Award sustaining the

dismissal of Steven L. Kawa by Special Board of Adjustment No. 1048 is entitled to deference by this Court and as such the Award stands.


_____

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: October 11, 2012